**FIRST TRUST CORPORATION TTEE FBO, Thomas Allen Moon; First Trust Corporation TTEE FBO, Jeanne R. Moon; First Trust Corporation TTEE FBO, William D. Moon; First Trust Corporation TTEE FBO, Betsy E. Moon; William D. Moon., Appellants,**

v.

**W.R. EDWARDS, Appellee.**

No. 05–04–00090–CV.

Court of Appeals of Texas, Dallas.

Aug. 23, 2005.

Rehearing Overruled Oct. 10, 2005.

---

Thomas Allen Moon, Dallas, for Appellants.

Derek Wesley Anderson, Marshall M. Searcy, Kelly, Hart & Hallman, P.C., Fort Worth, for Appellee.

Before Justices WRIGHT, MOSELEY and LANG.

## OPINION

Opinion by Justice LANG.

Appellant, First Trust, claims that the trial court erred in granting appellee Edwards's motion for judgment made after First Trust, the plaintiff below, rested its case in chief. The motion was based upon Edwards's defense that he had been released from First Trust's claims.

The facts giving rise to First Trust's claims and Edwards's release defense are intricate. However, First Trust's suit against Edwards was for breach of a commercial financing agreement. First Trust acquired the rights in the commercial financing agreement from a company named Medifund Financial Corporation (MFC), the party that originally contracted with Edwards. Edwards claims that, prior to First Trust acquiring its rights, he was released by MFC's shareholder and officer, Lionel Smith.

First Trust asserts two issues: (1) that the plain language of the Settlement Agreement, which Edwards raises as a defense, does not, as a matter of law, release Edwards from his obligation to pay MFC, or its assignee First Trust; and (2) that there is no evidence establishing that MFC, First Trust's assignor, authorized anyone to grant a release of its claims against Edwards.

For the reasons set forth below, we conclude that, on this record, as to the first issue, the settlement agreement in question does not, as a matter of law, release

and discharge Edwards from the claims of MFC on which First Trust brings suit. We also conclude, as to the second issue, that there is no evidence establishing that MFC authorized anyone to grant a release of its claims against Edwards. First Trust's issues are decided in its favor.

Edwards brings one cross point arguing for affirmance of the judgment on the premise that First Trust failed to present any evidence, in its case in chief, that MFC performed its contractual obligation to Edwards under the agreement and that Edwards breached his obligations. We decide that point against Edwards. Accordingly, the trial court's judgment is reversed and the case is remanded to the trial court for further proceedings.

## I. Factual and Procedural Background

In its case in chief, First Trust presented evidence that it foreclosured its security interest in MFC assets. As a result of the foreclosure, First Trust claims it succeeded to MFC's rights against Edwards in a commercial financing agreement between MFC and Edwards. First Trust sought damages from Edwards for the alleged breach of that agreement. At trial, Edwards made an oral motion for judgment after First Trust rested. That motion was based solely upon his defense that First Trust's claim, which it acquired from MFC, was previously released. According to Edwards, the purported release was included in a settlement agreement purportedly entered into by Edwards and MFC, through MFC's officer and shareholder, Lionel Smith. Edwards asserted that the settlement agreement was read into the record in a Dallas bankruptcy court proceeding respecting a bankruptcy debtor, W. Scott Blessing, M.D., P.A. That

bankruptcy debtor is not before the trial court below or this court. The bankruptcy proceeding is pertinent only because that is where the settlement agreement was made.

There is no dispute between those before us that a settlement agreement, read into the bankruptcy court record on August 30, 2000, disposed of numerous claims between several parties whose transactions were intertwined with the bankruptcy debtor. The particular dispute before us is respecting Edwards's assertion that the bankruptcy court agreement also discharged the claim of MFC sued upon by First Trust in the trial court below. At the time the motion for judgment was made by Edwards to the trial court, the parties argued their respective positions, the trial court took the matter under advisement, and, the next day, granted the motion. The written order of the trial court granting the motion does not state the basis for the ruling.

## II. Standard of Review

■ In considering whether a trial court erred in granting a motion for judgment in a non-jury case, we conduct both a legal and factual sufficiency review. *Hatch v. Williams,* 110 S.W.3d 516, 521 (Tex.App.-Waco 2003, no pet.) ("[b]ecause the judge in a bench trial is the arbiter of factual and legal issues, an appellate court must presume that the court ruled on the sufficiency of the evidence. Thus, the court's factual rulings will stand unless there is legally or factually insufficient evidence to support them."); *Qantel Business Sys. Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 304 (Tex.1988) (noting that on a motion for judgment in a non-jury case, the trial judge has the power to rule on the legal and factual sufficiency of the evidence). However, we review questions of law *de novo. Hatch,* 110 S.W.3d at 521.

■ We can find the evidence legally insufficient if: (1) there is a complete lack of evidence for the finding; (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence; (3) there is no more than a scintilla of evidence to support the finding; or (4) the evidence conclusively establishes the opposite of the finding. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997).

## III. Analysis

■ In order to determine whether there was insufficient evidence to support the trial court's ruling that Edwards's defense of release was proved, we must determine whether, as a matter of law, the bankruptcy court settlement agreement discharged MFC's claims against Edwards. In order to do so, we must construe the language of the release as it was read into the bankruptcy court record. There is no claim that the language is ambiguous, so the general rule is that a trial court must interpret the meaning of the language and ascertain the true intention of the parties from the language printed within the "four corners" of the agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* In construing the language, a court may consider evidence of the facts and circumstances surrounding the execution of the agreement. *Boales v. Brighton Builders, Inc.,* 29 S.W.3d 159, 167 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("A release will be construed in light of the facts and circumstances surrounding its execution."). Since the construction of an unambiguous agreement

is a matter of law, we examine the trial court's ruling *de novo*. *Coker*, 650 S.W.2d at 393 ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.").

The challenge in this case is to interpret the words dictated into the bankruptcy court record by the lawyers for the "parties." On August 30, 2000, before the United States Bankruptcy Court in Dallas, Edwards, Smith, W. Scott Blessing, M.D., P.A., W. Scott Blessing, M.D., and Lisa Blessing and others appeared, individually, or by counsel, to read into the record settlements in a complicated set of transactions and lawsuits. Smith's counsel took the lead. On the record, he described the terms as they related to several parties, including the Blessings, who were involved in bankruptcy proceedings, and others who were involved in related litigation, such as Smith and Edwards. Smith's counsel described in detail the parameters of the settlement agreement which included substantial standard release language.

## A. Pertinent Release Language

The language in the bankruptcy court settlement agreement, which Edwards asserts released him of MFC's claims, is a total of eleven lines in a thirty-page reporter's record for that hearing. These discrete eleven lines, in the context of the entire settlement agreement between Edwards and Smith, pertain to an adversary proceeding in the bankruptcy court, a Dallas County District Court suit, and general release of claims. The pertinent provisions of this settlement agreement are set out below, including the provision pointed to by Edwards as being dispositive which is "highlighted" in bold print: [1]

Specifically as relating to the state cause of action, Your Honor, and that is Cause Number DV99–10071, styled W.R. Edwards, Jr., versus Lionel Smith, and it's pending the 162nd Judicial District Court of Dallas County, Texas, and that's what the following relates to.

W. Rowland Edwards, Jr., and Lionel Smith have reached a settlement of cause number DV–10071, styled W.R. Edwards, Jr., versus Lionel Smith pending in the District Court of Dallas County, Texas, 162nd Judicial District, hereinafter referred to as lawsuit—state lawsuit.

**It is the intent of the parties that the reading of this agreement into the record of the bankruptcy court will have the same force and effect as if read into the record of the state court lawsuit. In addition to the mutual releases that follow, each party agrees to release the other from any claim or right to assert a claim against the other relating in any way to any claim by Medifund Management Corporation or Medifund Financial Corporation, collectively Medifund, relating to any payment due or claimed to be due by Edwards to Medifund, if any.** (emphasis added).

. . . .

Each party further acknowledges that he has not entered into a settlement or a release with Medifund relating to any amount due or claimed to be due by Edwards to Medifund, if any. Nothing herein shall be construed to release any claim which any party may have against Medifund and any recovery against Medifund shall be the recovery solely of the party obtaining the same.

---

1. We do not quote or discuss language and terms recited in the court record up to this point in the hearing since it relates to parties other than Smith and Edwards.

The settlement agreement continues with standard global release language discharging any claims by Edwards against Smith, including claims in the Dallas County suit. That language will not be recited. Because it is Smith's release of Edwards which is pertinent here, that language is set forth below:

Lionel Smith for himself, his heirs, administrators, executors, agents, servants, employees, attorneys, successors and assigns, and anyone else claiming by, through or under him does hereby release and forever discharge Edwards, his heirs, administrators, executors, agents, servants, employees, attorneys, successors and assigns, subrogees any and all other persons or entities in privity Edwards from any and all claims, liabilities suits, damages, judgments, causes of action or obligations of whatsoever nature, kind or character, whether at law or in equity, whether existing or arising under the laws of the State of Texas, United States of America, or any other state or other political subdivision, whether now known or unknown, whether now existing or that may exist hereafter, whether matured or unmatured, including but not limited to all claims arising which might arise directly or indirectly out of the occurrences which form the basis of the state court lawsuit, whether asserted therein or not.

This release is intended to be global and to cover all periods of time through and including the date this agreement is read into the record of the bankruptcy court, the state court, and any later date that the parties may further document this agreement, if any.

And two additional items which relate to both matters, both suits. If the parties mutually agree to further reduce their settlement to a more formalized settlement agreement document, they may do so. But in doing so, it is agreed that they do not intend to vary the terms of the agreement set forth herein.

Item two, the parties further agree that any provision of a formal settlement agreement which they cannot agree upon will not affect the forgoing agreements, and that any dispute that cannot be resolved will result in the provisions in dispute not to be included in the agreement.

And that's the sum total of what we worked out, Your Honor. And I guess I would start with getting confirmation from my co-counsel that I have correctly read into the record our agreement.

Then, the record reflects a discussion between the Bankruptcy Judge and counsel which appears to clarify details and is followed by assent from the parties to the terms of the agreement:

COURT: Ms. Gates? (Counsel for Edwards)

GATES: Yes, Your Honor.

Mr. Woolley (Counsel for Smith) has correctly read into the record the agreement that we have hammered out. What he's read, though, is intended to be sort of a—a—a summary of what we represent our agreement to be. We're going to do formalized settlement documents to memorialize the agreement.

And to the extent that there may be any little variations on the mutual release language, we're going to clean that up in the settlement documents. But, yes, we do have an agreement.

COURT: It's my understanding from the last point—it's my understanding from the last point that any written agreements cannot vary the terms that have been placed in the record, and if there's any dispute, the terms of the record will govern.

GATES: That's correct, Your Honor.

COURT: Okay.

WOOLLEY: And, Your Honor, I guess as a formality, we would ask the parties to confirm starting with Mr. Edwards.

COURT: Mr. Edwards, do you agree to the settlement?

EDWARDS: Yes, sir.

COURT: Thank you. Ms. Blessing?

BLESSING: Yes, sir.

COURT: Mr. Smith?

SMITH: Yes, sir.

COURT: Thank you.

WOOLLEY: And again on behalf of Dr. Blessing and Blessing, P.A., I think Ms. Blessing speaks also; is that correct?

BLESSING: Yes, sir.

COURT: Okay. Thank you. The Court will accept the terms of the settlement that have been read into the record and agreed to by the parties and their counsel. By accepting the terms into the record, the Court will make them binding on the parties and enforceable in federal court.

. . . .

COURT: The Court understands that the parties intend to actually draft and execute written settlement papers, but it's clarified in the record, this agreement placed on the record today is binding. If you are unable to reach a written agreement or if the written agreement varies with the terms that were placed in the record today, the record will govern any enforcement issues.

Before the parties retired, the court requested clarification of how the agreements affected Medifund Management Corporation's rights since it was in a Chapter 7 bankruptcy. The discussion was as follows:

COURT: Okay. Thank you. One other question and bankruptcy matter, and that would be, I think on point number two, the releases regarding—that pertained to Medifund. There was some discussion about a Medifund bankruptcy, and I never did have the record develop what the status of that was. Is there anything in that provision of the settlement that requires any presentation in the Medifund case?

GATES: Your Honor, I suspect, as a practical matter—well, as a matter of procedure, there is no requirement.

COURT: Thank you.

GATES: We may want to do it just so that the record is—complete. But Medifund Management Company— Corporation is the entity that is in bankruptcy right now.

COURT: Okay.

GATES: And Milo Segner is the Chapter 7—

HERSH: Seven.

GATES:—trustee.

COURT: Okay.

GATES: We will, as a courtesy to him, at least to let him know that the releases that we're affecting here are, to the extent that there's any ownership interest, that Mr. Smith or Dr. Blessing may have with respect to either entity as it relates to Mr. Edwards.

Counsel for Edwards continued the discussion before the court to assure the record was clear and the following transpired:

GATES: Your Honor, I do want to—the record to reflect **to the extent that Mr. Smith or Dr. Blessing may hold ownership interest in either Medifund Financial Corporation or Medifund Management, Inc., the latter of which is in Chapter 7, and that ownership interest allows Mr. Smith to—or Dr. Blessing to affect**

the outcome with respect to any claim that Medifund would have against Mr. Edwards, that we expected that this settlement agreement would have the effect—full force and effect to the—I guess, to the extent that it may and—as to those two entities. (emphasis added).

Now, I've said that. I realize that the Chapter 7 trustee in Medifund Management is the person who owns the—the company at this point for all intents and purposes, but however that would play out, obviously, we would want to present this settlement agreement as part of the resolution of claims that could be asserted against Mr. Edwards. (emphasis added).

Prompted by the description from Edward's counsel, Mr. Woolley, Smith's counsel, took issue with those comments and the following transpired between counsel and the court:

> WOOLLEY: Well, on that point, Your Honor, I think our agreement as we read it in there, I don't understand or believe that the intent is to try to affect what the corporations themselves may do or not do. (emphasis added).

I think that's—our leases [sic] deal with individuals to individuals, and frankly, I don't know enough about the Medifund bankruptcy or this other company to know what, if anything, Dr. Blessing or Mr. Smith could do or not do. (emphasis added).

But certainly, we're not trying to impair the company's ability to sue Mr. Edwards or Mr. Edwards to sue them except insofar as the claims—Mr. Edwards isn't going to go after Mr. Smith, Mr. Smith isn't going to go after Mr. Edwards and vice versa with the Blessings. (emphasis added).

> COURT: And the Chapter 7 debtors and Medifund Management Company, are the parties agreeing that the provision—I think it's point number two, of the releases that provide to Medifund are without prejudice to any rights of the Chapter 7 bankruptcy estate or Medifund Management Company?

> GATES: Right. And we understand that we can't release Chapter 7 estate.

> COURT: Okay. All right. Good. Thank you. **And the record, then, will reflect the parties do understand their releases, with regard to Medifund matters doesn't affect the administration of a Chapter 7 bankruptcy estate of Medifund Management Company, Inc., and as a result, should not require any approval by that bankruptcy estate.** (emphasis added).

> GATES: That's right, Your Honor.

> COURT: Okay.

> GATES: And again, just while it is as to the individual as to—the agreement is as to the individual of Mr. Smith and Dr. Blessing, **it is intended to—and the purpose for doing this was to reach any claim that—that they either would have as it relates to any ownership interest that either would have in those entities, Medifund Management, Inc., or Medifund Financial. Otherwise—**(emphasis added).

> COURT: I don't know what that means.

> GATES: Well, Medifund Financial is not in bankruptcy. So there is that entity that's still out there for which one of—

> COURT: I'm only concerned about the bankruptcy estate.

> GATES: That's right. So that's where—and so we know that to the extent that we're not—to the extent

that Medifund Management Corporation is in bankruptcy and the Chapter 7 trustee is in place, we can't affect a release of—as it relates to the Chapter 7 trustee.

COURT: Right.

GATES: We know that.

COURT: Okay. All right. Thank you. I think then the reservation the Court's put on the record protects that bankruptcy estate. And it also means the parties don't have to go take this agreement to that. The Court will see this case and seek approval.

It must be noted now, before we proceed further, that although the parties repeatedly stated the agreement read into the record would be "formalized" in written documents, this record contains no such documents. However, the Bankruptcy Judge observed that should the parties not execute formal, written agreements, the bankruptcy court record would "govern any enforcement issues." According to the record, the parties voiced no objection to this statement from the Bankruptcy Judge.

In addition to the language read into the Bankruptcy Court record, First Trust urges us to consider testimony from Mr. Woolley in the trial court below where he said he did not represent MFC at the bankruptcy court hearing when the settlement agreement was read into the record. Also, we are reminded that Mr. Woolley said, in the above quoted record before the bankruptcy court, that he was unfamiliar with MFC. Rather, Woolley stated he represented only the interests of the Blessing bankruptcy entities and Mr. Smith.

## B. Interpretation of Release Language

### i. Scope of Language to be Interpreted

First Trust contends no release by MFC appears anywhere in the record of the

bankruptcy court respecting the settlement. Of course, Edwards argues that the pertinent release language, which was highlighted in the first excerpt above, reflects a release of MFC's claims. Also, Edwards argues that, under the law, we may not interpret the release by considering the discussion with the Bankruptcy Judge after Smith and Edwards indicated their respective assents to the terms. We disagree with Edwards's positions.

Our consideration must be of the entire agreement, certainly not just the discrete paragraph identifying Smith's claims, "if any," respecting MFC's claims against Edwards. Also, we are not limited, as argued by Edwards, to a consideration of the bankruptcy court record up to and including the announced assent of Edwards and Smith. Such a barrier would be an undue curtailment of our obligation to interpret the entire agreement. This release is not a standard release transaction where drafts of the documentation would likely be traded back and forth, scrutinized by counsel for the parties with the opportunity to comment and seek revision, and then offered to the parties to be executed. Rather, according to the record, at the time the releases were read into the bankruptcy court record, the parties had been in trial for at least three days and the terms of the releases were negotiated during trial and at recesses. So, it is not unreasonable for the parties and the Bankruptcy Judge, who was asked to approve the settlement and pronounce it to be enforceable, to have discussions on the record to clarify and hone the terms.

### ii. Analysis of Agreement Language

Our first step in the comprehensive review of the language is to analyze the standard, general release language. The

standard, general release language is virtually identical for both Smith and Edwards. The language of Smith's release of Edwards expressly provides that "Lionel Smith for himself, his heirs, administrators, executors, agents, servants, employees, attorneys, successors and assigns, and anyone claiming, by through or under him does hereby release and forever discharge Edwards ..." Although the claims released in this standard, general release language include all claims of any kind, and specifically, the Dallas County suit, that language does not expressly refer to claims by MFC against Edwards.

Second, we consider the reference to MFC in the discrete provision asserted by Edwards. That part of the release is set out in the early language of the agreement and prior to the recitation of standard, general release language. This discrete portion is described as "mutual" in the respect that "each party" releases "the other" from "any claim or right to assert a claim against the other in any way relating to any claim by Medifund Management Corporation or Medifund Financial Corporation, collectively Medifund, relating to any payment due or claimed to be due by Edwards to Medifund, if any."

No mention is made anywhere in the record of MFC releasing either Edwards or Smith. The words merely identify a release of "the parties," who are Smith and Edwards, by "the parties," again, who are Smith and Edwards, "relating to any payment due or claimed to be due by Edwards to Medifund, if any." Nowhere in the agreement does Medifund Financial Corporation appear as a grantor of a release, nor does any language describe anyone granting a release for, or on behalf of, MFC.

 It is axiomatic that "[a] release does not bind one who is not a party to it." *Anderson Furniture Company v. Roden,*

255 S.W.2d 345, 352 (Tex.Civ.App.-Amarillo 1952, writ ref'd n.r.e.). Further, a person is not bound by a release executed by a third party unless he authorized the third party to act for him. *City of Amarillo v. Hill,* 278 S.W.2d 332, 334 (Tex.Civ. App.-Amarillo 1954, no writ); *Dwyer v. Sabine Mining Co.,* 890 S.W.2d 140, 143 (Tex.App.-Texarkana, 1994, writ denied). MFC is not a party to the release, nor is there any authorization by MFC in the record to release its rights or claims.

The release must be interpreted according to its express terms. Accordingly, we conclude the clear intention expressed in this release is to comprehensively dispose of all claims between "the parties," i.e., Smith and Edwards.

## C. Edwards Asserts that First Trust Attacks Smith's Authority

As additional support for his position, Edwards asserts that First Trust's argument on the limits of the release is actually a challenge to the authority of Smith to grant the release. On that premise, Edwards says First Trust has the burden to plead and prove matters of avoidance such as lack of authority. However, since First Trust did not plead or prove that position, Edwards claims that defense is waived. As support, Edwards cites us to *Womble v. Atkins,* 160 Tex. 363, 331 S.W.2d 294, 297 (1960) and *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990).

We cannot agree that the legal propositions described in *Womble* and *Williams* are applicable. In *Womble,* the plaintiff sought to set aside a release on the grounds that such a release was not based upon a valid consideration and had been procured by fraud. *Womble,* 331 S.W.2d at 295. Similarly, in *Williams,* the plaintiff sought to set aside a release on the grounds of mutual mistake. *Williams,* 789

S.W.2d at 264. Both *Womble* and *Williams* involved a party seeking to avoid or set aside a release which otherwise, by its terms, purported to effect a release. That is markedly distinguishable from the facts before us.

Here, First Trust simply argued that the release in the settlement agreement, by its language, did not discharge MFC's claims against Edwards. The use of the settlement agreement by Edwards as a bar to First Trust's claims puts in focus the meaning of the language of the release, not the authority of the executing parties. The question here is: does the release discharge a corporate, MFC claim against Edwards? We have concluded that the release does not do so. Accordingly, First Trust was not required to plead lack of authority or related affirmative defenses.

In a slightly different vein, Edwards asserts that, even if First Trust did not waive its position, the record in the trial court below includes evidence that Smith, as the sole shareholder and president of MFC, effected a release. We disagree with Edwards.

Once again, the issue here is not one of authority. It is a matter of the scope and meaning of the language of the release. The language of the discrete provision urged by Edwards is not a release of MFC's claims as an act of MFC. On this record, MFC is simply not a party to the settlement agreement or the discrete release language and cannot be bound by the language of the release. *See Dwyer,* 890 S.W.2d at 143. Furthermore, the status of Smith, asserted to be the sole shareholder and officer of MFC, is not set out in the language of the release, nor does that status relate to the interpretation of the language of the release itself which the parties agree is unambiguous. To inject into the language of the release Smith's shareholder and officer status of MFC, as Ed-

wards would have us do, would cause us to improperly vary the clear and unambiguous language that reflects the mutual releases of individuals. It would cause us to rely upon evidence which is extrinsic to the language within the "four corners" of the release. *See Coker,* 650 S.W.2d at 393. We will not do that when the language is unambiguous, as in this case.

## D. Edwards Asserts MFC's Charter Forfeiture Vests Smith with Power to Release

■ Next, we address another argument Edwards made to the trial court asserting that Smith was empowered and authorized individually to effect a release of MFC's claims against Edwards. Specifically, Edwards asserts that since MFC had forfeited its corporate charter on March 9, 1999, and the charter was not reinstated until after the release was made on the bankruptcy court record, Smith was vested with the power, individually, to discharge MFC's claims, and he did so.

The record reflects that the forfeiture of MFC's corporate charter was ordered by the Texas Secretary of State, in accordance with Section 171.309 of the Tax Code, because of nonpayment of fees and failure to file its franchise tax report. *See* TEX. TAX CODE ANN. § 171.309 (Vernon 2002 & Supp.2004–05). Based upon this forfeiture, Edwards argued to the trial court that Smith's participation in the settlement agreement effected a release of MFC's claims since: (1) "the only person that's left under the provisions of the Texas Business Corporation Act who has the obligation to wind down its operations" is Smith, (2) "there is no Medifund Financial other than through Mr. Smith," and (3) Smith was MFC's "alter ego." We cannot agree with Edwards's position on these arguments.

Forfeiture of a Texas corporation's charter, by order of the Texas Secretary of State, causes an involuntary dissolution of the corporation. TEX. TAX CODE ANN. § 171.309; *See* TEX. BUS. CORP. ACT ANN. art. 7.01 (Vernon 2003). However, a dissolved corporation "shall continue its corporate existence for a period of three years from the date of dissolution, for the following purposes: . . . (3) holding title to and liquidating any properties or assets that remained in the dissolved corporation at the time of, or are collected by the dissolved corporation, after, dissolution, and applying or distributing those properties or assets, or the proceeds thereof . . ." TEX. BUS. CORP. ACT ANN. art. 7.12A(3) (Vernon 2003 & Supp.2004–05). Accordingly, forfeiture of a corporation's charter causes an involuntary dissolution, yet it continues to exist for three years for the limited purposes delineated in the statute. It is critical to note that the corporation continues to hold title to "any properties or assets." Additionally, distribution of assets is required to proceed pursuant to Art. 6.04A(3). That section prescribes that only after corporate debts are paid, "the corporation shall" distribute the assets to the shareholders. TEX. BUS. CORP. ACT ANN. art 6.04A(3) (Vernon Supp.2004–005). "As a result, a corporation whose charter is forfeited under the Tax Code is considered to be involuntarily dissolved pursuant to Article 7.12 and the directors will have the duties and obligations provided for under Article 7.12, and the corporation may engage in the activities provided under that section." TEX. BUS. CORP. ACT ANN. art 7.12 cmt.; *In re ABZ Insurance Servs., Inc.*, 245 B.R. 255, 261 (Bankr.N.D.Tex.2000) (effect of charter forfeiture causes involuntary dissolution and continued existence with limited rights for three years under Art. 7.12).

The clear provisions of the statutes do not support Edwards's contention during oral argument before us that once MFC forfeited its charter, there was no Medifund other than through Mr. Smith. Rather, according to Art. 7.12B(3), the corporation continues to exist for limited purposes set out in the statute. In fact, the dissolved corporation's assets do not become those of its shareholders, but remain vested in the corporation. Article 7.12B(3), in conjunction with Art. 6.04A(3), requires that creditors be paid before any assets are distributed to shareholders. Accordingly, the corporate entity and form continues and cannot be disregarded by the trial court based solely upon forfeiture of its corporate charter. We have not been cited to any portion of the record or any authority which would support Edwards's assertions to the contrary.

We conclude that First Trust has met its burden to show the facts are legally insufficient to support Edwards's motion for judgment. First Trust's two points on appeal are decided in its favor.

## E. Edwards Asserts First Trust's Lack of Proof on Claims Supports Granting Motion for Judgment

Now, we address Edwards's cross point that the trial court's grant of his motion for judgment must be upheld since First Trust failed to present any evidence in support of its claim that MFC performed its obligations under its agreement with Edwards and that Edwards breached that agreement. We cannot agree with Edwards's position.

The record reflects Edwards's motion was based solely upon the defense of release. The general rule is that, in a nonjury trial, where no findings of fact or conclusions of law are requested or provided by the court, the court's judgment will be upheld if there is any factual basis to do so supported by the facts and the plead-

ings. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex.1984). However, where the judgment is rendered based upon a motion for judgment narrowly focused upon only one issue, a reviewing court cannot sustain the granting of that motion for judgment on some premise not asserted. *See Prather v. McNally*, 757 S.W.2d 124, 126 (Tex. App.-Dallas 1988, no writ) ("[D]irected verdict should be affirmed if it is supported by any ground asserted in the motion, even though the rationale assigned by the trial court for granting the motion was erroneous."); *see also Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991) ("When the trial court states no reason why judgment n.o.v. was granted, and the motion for judgment n.o.v. presents multiple grounds upon which judgment n.o.v. should be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion."). We decide this point against Edwards.

### IV. Conclusion

We conclude that the unambiguous language of the release given by Smith to Edwards does not effect a discharge of MFC's corporate claims against Edwards. As a result, there is no evidence in the record to support the trial court's judgment rendered on Edwards's motion for judgment. The trial court's judgment is reversed and the case is remanded for a new trial consistent with this opinion.