NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0541n.06
Filed: September 4, 2008

Nos. 07-1773/07-1815

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GUARANTY RESIDENTIAL LENDING, INC. and ASSURAFIRST FINANCIAL CO., | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiffs/Counterdefendants–Appellees/Cross-Appellants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| v. | ) | |
| | ) | **O P I N I O N** |
| HOMESTEAD MORTGAGE CO., L.L.C., | ) | |
| | ) | |
| Defendant/Counterplaintiff–Appellant/Cross-Appellee, | ) | |
| | ) | |
| BOB FITZNER, | ) | |
| | ) | |
| Counterplaintiff–Appellant/Cross-Appellee. | ) | |
| | ) | |

BEFORE:   DAUGHTREY and McKEAGUE, Circuit Judges; and VAN TATENHOVE, District Judge.[*]

**McKEAGUE, Circuit Judge.**   This appeal of a dismissed trademark suit involves no trademark law.  Instead, the appeal centers on the interplay of the federal rule governing a party's capacity to sue, federal bankruptcy law, and Texas tax and corporate law.  The district court concluded that the Counterplaintiffs do not have the capacity to bring their counterclaims in federal court.  For the reasons set forth below, we reverse.

_____

[*]The Honorable Gregory Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**I**

**A.     Original Posture of the Lawsuit**

This case has a humble origin.  Since 1987, Guaranty Residential Lending, Inc. ("GRL") provided mortgage-related services in Michigan under the marks "Homestead USA" and "Homestead Mortgage."  GRL alleged that sometime after it began to use these marks, Homestead Mortgage Company, LLC ("HMC") engaged in similar mortgage-related services in Michigan under the name of "Homestead Mortgage."  GRL sued HMC for intentional misappropriation of its common-law trademarks in December 2004.  Shortly thereafter, GRL sold its mortgage business to AssuraFirst Financial Co. ("AssuraFirst"); the latter company joined this lawsuit as a plaintiff in June 2005.

**B.     Bob Fitzner and Bob Fitzner, Inc.**

GRL's use of its common-law marks was not, however, itself without complication.  Bob Fitzner, a resident of Texas, had incorporated "Bob Fitzner, Inc." ("BFI") as a Texas corporation in 1992.  He was the president and sole owner.  BFI had filed the mark "Homestead Mortgage" with the U.S. Patent and Trademark Office in 1993.  The office registered it as a trademark in 1996 (the "Mark").  At the time it sued HMC, GRL knew about BFI's Mark.  In 2001, the U.S. Patent and Trademark Office had denied GRL's application to register its own marks because of the likely confusion with the Mark.

On March 20, 2001, the Comptroller of the State of Texas forfeited BFI's corporate privileges for failure to pay its franchise fee.  As a result, BFI could no longer sue or defend in a state

or federal court in Texas. Tex. Tax Code § 171.252(1). Texas courts refer to the forfeiture of privileges as a split in corporate assets: legal title to the assets remains in the company while beneficial (or equitable) title passes to the shareholder personally. *El T. Mexican Rests., Inc. v. Bacon*, 921 S.W.2d 247, 251 (Tex. App. 1995). On March 22, 2002, the Secretary of State of Texas forfeited the company's charter.

On August 1, 2001 (after BFI's forfeiture of corporate privileges but before its forfeiture of charter), Fitzner filed for Chapter 7 bankruptcy protection. On his schedule of personal property, Fitzner listed "Stock and interest in incorporated business of: Homestead Mortgage Company." He did not list his beneficial title to the assets of BFI or note that he was personally liable for any newly incurred debts of BFI. His case was initially closed on January 29, 2002, but later reopened on his motion on February 11, 2003. The case was finally closed on January 20, 2006.

## C.     Bob Fitzner Became Involved in the Lawsuit

On January 17, 2005, BFI assigned the Mark to Fitzner for $1.00. The assignment was to be effective March 8, 2002. Fitzner turned around and licensed the Mark to HMC on January 26, 2005, for $10,000.

On July 5, 2005, HMC filed an answer and countercomplaint in this lawsuit. Fitzner, d/b/a Homestead Mortgage Co., was added as a Counterplaintiff, in his individual capacity. BFI was not added and is not a party to this lawsuit.

**D.      The District Court Concluded that Neither HMC nor Bob Fitzner Had the Capacity to Sue**

GRL and AssuraFirst (collectively, the "Counterdefendants") moved to dismiss the counterclaims for lack of standing to sue. (Their own claims against HMC are not germane to this appeal.) The counterclaims were all premised on the rights of HMC and Fitzner (collectively, the "Counterplaintiffs") to the Mark.

The district court found that, under Texas law, BFI had legal title to the Mark and, therefore, could pass such title to Fitzner, who could then license such title to HMC. *Guar. Residential Lending, Inc. v. Homestead Mortgage Co., LLC*, 463 F. Supp. 2d 651, 661-62 (E.D. Mich. 2006) ("*GRL I*"). The district court held that legal title was sufficient to confer standing on the Counterplaintiffs. *Id.* at 662.

The district court went on to address the related question of capacity to sue. *Id.* at 661-62. Section 521 of the Bankruptcy Code requires that a debtor list his "assets and liabilities" on a schedule attached to the bankruptcy application. 11 U.S.C. § 521(a)(1)(B)(i). Even if a particular interest in property is not scheduled, it still is considered part of the debtor's estate. *See id.* § 541(a). If the debtor has an interest in property properly considered part of the estate, but not listed on the schedule, that unscheduled interest is not automatically abandoned back to the debtor when the case is closed, but instead remains part of the bankruptcy estate. *Id.* § 554(c),(d).

Fitzner did not schedule his beneficial title to the Mark when he filed his bankruptcy petition. Accordingly, when the bankruptcy court closed Fitzner's case, beneficial title to the Mark was not abandoned back to Fitzner but instead remained part of the estate. *GRL I*, 463 F. Supp. 2d at 661.

Thus, the district court concluded, Fitzner did not hold beneficial title to the Mark when he licensed it to HMC. *Id.* at 662. Without beneficial title, neither HMC nor Fitzner had the capacity to sue on the Mark. *Id.*

### E.    Two Avenues to Regain Capacity

Fitzner then took two separate avenues to regain capacity. Fitzner first moved to reopen his bankruptcy case. He asked that the bankruptcy court order the trustee to abandon beneficial title to the Mark back to him. The bankruptcy court denied his request because, among other things: (1) the estate and creditors would receive little benefit from the reopening; (2) Fitzner had profited from the Mark, even though the Mark "belongs to the bankruptcy estate"; and (3) he took inconsistent positions during litigation as to who had title to the Mark. *In re Bobbie Fitzner*, No. 01-70668, order at 2 (Bankr. N.D. Tex. Dec. 22, 2006). Fitzner did not appeal the denial of his motion to reopen.

Upon being denied relief in bankruptcy court, Fitzner paid the past-due corporate fees for BFI. Pursuant to Texas Tax Code § 171.312, the Texas Secretary of State reinstated BFI's corporate privileges and charter on January 23, 2007. Counterplaintiffs maintained that the reinstatement was retroactive under Texas law. The reinstatement was intended to make whole the transfer of the Mark from BFI to Fitzner as well as the license from Fitzner to HMC.

### F.    The Counterdefendants' Second Motion to Dismiss

The Counterdefendants took a second pass at dismissing the counterclaims, this time explicitly attacking the Counterplaintiffs' capacity to sue. The district court noted that the

bankruptcy court rejected Fitzner's attempt to reopen his bankruptcy case, and thus capacity was not regained through that avenue. *Guar. Residential Lending, Inc. v. Homestead Mortgage Co., LLC*, No. 04-74842, 2007 WL 1140917, at \*5-6 (E.D. Mich. Apr. 17, 2007) ("*GRL II*"). The district court further held that it would read the bankruptcy court's statement that the estate "owns" the Mark as it was written, and would not consider the Counterplaintiffs' argument that, at most, the estate held beneficial title to the Mark. *Id.* at \*5. The district court further pointed out that BFI was not a party to the lawsuit, and, therefore, even if Texas Tax Code § 171.252(1) did not preclude BFI from suing in a court outside of Texas, the company did not do so here. *Id.* at \*6. Finally, the district court rejected the argument that the reinstatement of BFI's privileges and charter cured the lack of capacity; it found that "Fitzner lack[ed] the authority to reinstate the charter in order to free assets from the bankruptcy estate." *Id.* at \*7. Concluding that the Counterplaintiffs' attempts at curing capacity failed, the district court granted the Counterdefendants' motion to dismiss. *Id.* at \*8.

The Counterplaintiffs appealed the district court's dismissal of their counterclaims. For their part, the Counterdefendants filed a conditional appeal, pursuing their argument that the counterclaims could have been dismissed on judicial estoppel grounds, an argument rejected by the district court. *GRL I*, 463 F. Supp. 2d at 662.

## II

### A.    Standard of Review

We review de novo a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 671 (6th Cir. 2006).

"[C]apacity is conceived to be a party's personal right to litigate in a federal court." 6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1542 (2d ed. rev. 2008) ("Wright"). Federal Rule of Civil Procedure 17(b) provides that the "[c]apacity to sue or be sued is determined . . . (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile; [and] (2) for a corporation, by the law under which it was organized[.]" Because Fitzner is domiciled in Texas and BFI was incorporated in Texas, we look to Texas statutes and judicial decisions construing those statutes to determine capacity. 6A Wright § 1559.

## B.     Analysis

The pivotal issue on appeal is this: when the trustee abandoned the estate back to Fitzner, did Fitzner still have an equitable interest in the Mark that existed at the time he commenced his bankruptcy case? If so, then his failure to schedule that interest would mean that it was not abandoned and the interest would be classified as property of the estate. Without full ownership of the Mark when he licensed it to HMC, neither Fitzner nor HMC would have the capacity to sue on the Mark. If not, then he had no duty to schedule an interest in the Mark and nothing remains in the bankruptcy estate to hinder the Counterplaintiffs' capacity to sue on the Mark.

As explained more fully below, the Counterplaintiffs have capacity to sue. Texas law resulted in the brief split of legal and beneficial titles to the Mark when BFI's corporate privileges were forfeited. The split was, however, only temporary. When the company subsequently forfeited its charter, Texas law deemed the company to have been dissolved. One of the effects of dissolution was to rejoin legal and beneficial titles. As BFI had regained the full right to sue or defend on the

Mark by the time the company sold it to Fitzner, Fitzner likewise had full power when he licensed

the Mark to HMC and joined this lawsuit.

### 1. Forfeiture of BFI's Privileges Splits Title to Mark

Under federal bankruptcy law, "all legal or equitable interests of the debtor in property as of

the commencement of the case" become part of the bankruptcy "estate." 11 U.S.C. § 541(a)(1). The

debtor must list all legal or equitable interests in property on a schedule of assets and liabilities. *Id.*

§ 521(a)(1)(B)(i). If he fails to list an asset, that asset is not automatically abandoned back to the

debtor when the case is closed but instead remains part of the estate. *Id.* § 554(c),(d).

In determining the existence and scope of a debtor's legal or equitable interest in property,

we look to state law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979). As noted above, when the

Comptroller forfeited BFI's privileges pursuant to Texas Tax Code § 171.252(1), the company could

no longer sue or defend in a state or federal court in Texas. Moreover, as president of BFI, Fitzner

became personally liable for any debt of BFI incurred after its failure to pay its fees and before the

privileges were revived. Tex. Tax Code §§ 171.252(2); 171.255. The loss of privileges created a

split in title to the assets held by the company: legal title to the assets remained with the company,

while the shareholder held beneficial title to the assets. The latter title permitted the shareholder to

sue or defend in Texas courts on behalf of the company to protect the shareholder's interest.

Texas courts appear to treat a beneficial title as an equitable interest in property. *Ayers v.*

*Mitchell*, 167 S.W.3d 924, 928 (Tex. App. 2005) (trust context). This equitable interest in an asset

is distinct from a shareholder's interest in the corporation, even if the shareholder owns 100% of the company. *El T. Mexican Rests.*, 921 S.W.2d at 251.

As a result of BFI's loss of corporate privileges, Fitzner held beneficial title to all assets of the company, including the Mark, at the time he filed for personal bankruptcy protection. Therefore, the district court concluded, he should have listed the title on his schedule as a separate equitable interest in property, but he did not. *GRL I*, 463 F. Supp. 2d at 661-62.

### 2. Right to Sue or Defend Outside of Texas Remained with BFI

One issue not addressed by the district court or in the parties' briefs is an exemption from estate property found at Bankruptcy Code § 541. This provision states that "[p]roperty of the estate does not include–(1) any power that the debtor may exercise solely for the benefit of an entity other than the debtor[.]" 11 U.S.C. § 541(b)(1). Under Texas law, the shareholder's right to sue or defend based on his beneficial title is considered a right exercised on behalf of the corporation, not on behalf of the shareholder personally. *El T. Mexican Rests.*, 921 S.W.2d at 251. Thus, even if Fitzner was required to schedule an equitable interest in the Mark, it is unclear whether his failure to do so had any effect on his right to sue or defend on the Mark on behalf of BFI, a right that § 541(b)(1) would seem to exempt from the bankruptcy estate. However, given the dearth of relevant case law on this point, as well as the fact that there are alternate grounds for reversing the district court, *see infra*, we decline to address the matter further.

Even assuming arguendo that bankruptcy law required that Fitzner schedule his beneficial title to the Mark when he initially filed for Chapter 7 relief, one right not included in the beneficial

title was the right to sue or defend on the Mark outside of Texas. Texas law is clear that BFI retained the right to sue or defend in a lawsuit outside of Texas, even after the company's corporate privileges were forfeited. Tex. Tax Code § 171.252(1) ("[T]he corporation shall be denied the right to sue or defend in a court of this state."); *El T. Mexican Rests*., 921 S.W.2d at 252 n.6 ("But a corporation may . . . maintain the cause of action in a jurisdiction other than Texas."). Thus, the argument goes, when BFI transferred all of its rights to the Mark to Fitzner in January 2005, one of those rights was the right to sue or defend outside of Texas, as distinct from the right to sue or defend in Texas.

The district court offered two reasons for rejecting this line of reasoning. It noted that Fitzner did not bring the counterclaims on BFI's behalf, but rather his own as an individual. *GRL II*, 2007 WL 1140917, at *6. True, but that does not directly address the contention that when BFI transferred all of its rights to Fitzner, one of those was the right to sue or defend outside of Texas. Put differently, BFI always had the capacity to sue outside of Texas, and when it transferred all of its rights to the Mark to Fitzner, he gained by that transfer (and not by ownership of beneficial title) the capacity to sue in Michigan. The district court went on to state that the case is complicated by Fitzner's bankruptcy case and the interest he had in the Mark that should have been listed on his schedule of assets. *Id.* As discussed below, however, there is less to the bankruptcy case than meets the eye.

### 3.     Dissolution of BFI Rejoined Title to Mark

The split in title described above is not the end of the story. After the Comptroller forfeited BFI's corporate privileges, when the next deadline passed, the Secretary of State forfeited the

company's corporate charter. The Counterplaintiffs argue that this forfeiture resulted in the dissolution of the company. As explained below, a dissolved corporation remains in existence for a limited wind-down period and, during that period, has certain explicit rights, including the right to sue or defend in any court.

The Counterdefendants dispute that BFI was dissolved, but they do so without any analysis or citation to Texas law. *See* Counterdefendants/Appellees' Br. at 34 n.10. In its October 2006 opinion, the district court quoted extensively from a Texas Court of Appeals decision for, among other things, the proposition that forfeiture of a corporate charter does not thereby result in dissolution of the corporation. *GRL I*, 463 F. Supp. 2d at 660 (quoting *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App. 1992)). However, that state appellate decision relied upon pre-1993 Texas law.

Under the Texas Business Corporation Act, "[a] corporation may be dissolved involuntarily by order of the Secretary of State when it is established that . . . (1) The corporation has failed to file any report within the time required by law, or has failed to pay any fees, franchise taxes or penalties prescribed by law when the same have become due and payable[.]" Tex. Bus. Corp. Act Art. 7.01 § B(1). While the use of the permissible "may" could be read to permit, but not require, the Secretary of State to dissolve a company whose charter was forfeited, the Texas Business Corporation Act was amended in 1993 to define a "dissolved corporation" as including one "whose charter was forfeited pursuant to the Tax Code, unless forfeiture has been set aside." *Id.* Art. 7.12 § F(1)(e). Courts have read the amended Texas Business Corporation Act as causing the automatic dissolution of a corporation upon the Secretary of State's forfeiture of the corporation's charter. As

explained by the Texas Court of Appeals in *First Trust Corp. TTEE FBO v. Edwards*, "Forfeiture of a Texas corporation's charter, by order of the Texas Secretary of State, causes an involuntary dissolution of the company." 172 S.W.3d 230, 241 (Tex. App. 2005) (citations omitted); *see also In re Am. Heartland Sagebrush Sec. Invs., Inc.*, 334 B.R. 848, 852 (Bankr. N.D. Tex. 2005) ("Sagebrush was deemed a dissolved corporation upon forfeiture of its charter by the Secretary of the State of Texas."); *In re ABZ Ins. Servs., Inc.*, 245 B.R. 255, 261 (Bankr. N.D. Tex. 2000) ("The Secretary of State . . . forfeited ABZ's charter per Tex. Tax Code § 171.309, et seq.  The effect of this charter forfeiture was to bring into play ABZ's dissolution under Tex. Bus. Corp. Act, Art. 7.12F(1)(e)."). Thus, once the Secretary of State forfeited BFI's charter on March 22, 2002, the company was deemed dissolved under the Texas Business Corporation Act.

In a case relied upon by both parties and the district court, the Texas Court of Appeals in *El T. Mexican Restaurants* was similarly analyzing pre-1993 Texas corporate law.  Thus, while the state appellate court's statement that neither forfeiture of privileges nor forfeiture of the corporate charter "constitutes a dissolution" of the company, 921 S.W.2d at 250 n.2, is still technically correct—forfeiture of the corporate charter is distinct from dissolution of the corporation—the statement should not be read too broadly.  Since 1993, forfeiture of the corporate charter for failure to pay the applicable fees results in the company's dissolution.

Somewhat paradoxically, one of the effects of BFI's dissolution was to give back to it the right to sue or defend in Texas courts.  Under the Texas Tax Code, a corporation loses its right to sue or defend in Texas courts when its privileges are forfeited; however, under the Texas Business Corporation Act, if the corporation is later dissolved, it continues its existence for a limited time for

any of several reasons, including bringing or defending a claim in any court. Specifically, under Article 7.12 § A of the Texas Business Corporation Act, a dissolved corporation continues its corporate existence for a period of three years from the date of dissolution for any of the following purposes:

> (1) prosecuting or defending in its corporate name any action or proceeding by or against the dissolved corporation;
>
> (2) permitting the survival of any existing claim by or against the dissolved corporation;
>
> (3) holding title to and liquidating any properties or assets that remained in the dissolved corporation at the time of, or are collected by the dissolved corporation after, dissolution, and applying or distributing those properties or assets, or the proceeds thereof, as provided in Subsections (3) and (4) of Section A of Article 6.04 of this Act; and
>
> (4) settling any other affairs not completed before dissolution.
>
> However, a dissolved corporation may not continue its corporate existence for the purpose of continuing the business or affairs for which the dissolved corporation was organized.

Although this right-granting provision of the Texas Business Corporation Act appears to clash with the right-stripping provision of the Texas Tax Code, courts have harmonized the two statutes. When a corporation forfeits its privileges, its right to sue or defend in Texas courts is transferred to its shareholders pursuant to the Texas Tax Code. However, if a corporation goes on to "forfeit[] its charter for failure to pay franchise taxes, the Texas Business Corporations Act then becomes controlling and the corporation continues its existence for the limited purposes described under article 7.12." *Guardian Life Ins. Co. of Am. v. Kinder*, No. H-06-1745, 2008 WL 243707, at

*2 (S.D. Tex. Jan. 29, 2008)); *see also In re ABZ*, 245 B.R. at 261 (explaining the interplay between the Texas Tax Code and the Texas Business Corporation Act).

By placing the right to sue or defend back in the corporation, Article 7.12 had the effect of giving back to the corporation beneficial title to all of its assets during the wind-down period. *See In re ABZ*, 245 B.R. at 261. Thus, as of March 22, 2002, when BFI forfeited its charter and hence was deemed dissolved, it had a three-year wind-down period in which it retained its corporate existence in order, among other things, to sue or defend itself and to hold title and liquidate any assets.

### 4.      Beneficial Title Expired

According to this analysis, Fitzner held beneficial title to the Mark as of March 21, 2001, prior to the date he filed for bankruptcy. However, that interest was extinguished when BFI dissolved on March 22, 2002, and the right to sue or defend was given back to the company. Thus, assuming that Fitzner should have scheduled his beneficial title when he filed for bankruptcy protection, did his failure to do so have any repercussions after BFI was dissolved? To put the question differently, when what was left of the bankruptcy estate was finally abandoned back to Fitzner, was the otherwise extinguished beneficial title to the Mark considered an unscheduled asset, thereby requiring that the interest somehow be resuscitated back from its earlier extinction?

The short answer is no; once the legal and beneficial titles to the Mark were rejoined in BFI, Fitzner no longer had any personal title to the Mark. A bankruptcy trustee cannot hold rights greater than those that could have been held by the debtor. 5 *Collier on Bankruptcy* ¶ 541.04 (Alan R.

Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate . . . ."); *see also Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356 (3d Cir. 2001) ("[I]n actions brought by the trustee as successor to the debtor's interest under section 541, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor." (internal quotation marks omitted)); *Murray v. Royal Alliance Assocs.*, 375 B.R. 208, 212-13 (M.D. La. 2007) (holding that "the Trustee in the case at bar can only bring a claim that Pooled Pension—being the bankrupt debtor—could have brought had bankruptcy not intervened"). For instance, if a debtor was precluded from bringing a cause of action by the applicable statute of limitation, the trustee is likewise precluded. 5 *Collier on Bankruptcy* ¶ 541.08. Rights that would have been lost to the debtor by operation of law had the bankruptcy case not intervened are likewise lost to the trustee. When BFI dissolved, beneficial title expired as a separate interest, regardless of whether such title was held by Fitzner or the trustee of his estate.

### 5. BFI Transferred Full Title to the Mark to Fitzner

Once BFI dissolved, the company held full title to the Mark. As the only officer of BFI, Fitzner had the authority under Article 7.12 to liquidate the assets of BFI, including the Mark. (In his capacity as an officer, he had to liquidate the assets in accordance with Article 6.04, which required, among other things, that creditors of BFI be notified before assets were transferred to shareholders. However, any claim arising under Article 6.04 would be by a creditor of the company, not by the bankruptcy trustee or a creditor of Fitzner individually.) BFI transferred all of its rights

to the Mark to Fitzner in January 2005, before the three-year wind-down period expired. Thus, Fitzner personally acquired full title to the Mark at that time.

When he acquired full title to the Mark, Fitzner's bankruptcy case had been commenced, closed, and then reopened. Thus, the estate had long been set; as explained above, the bankruptcy estate consists of all interests in property held by the debtor at the time the case is commenced. 11 U.S.C. § 541(a). The only personal interest in the Mark that Fitzner had at the beginning of his bankruptcy case was the beneficial title, but that interest was shortly extinguished under Texas law. Just before the transaction with BFI, the only interest Fitzner had in the Mark was one as a shareholder of BFI. It is undisputed that he listed his 100% ownership of BFI in his initial schedule of assets and had disclosed the company's ownership of the Mark to the trustee early in the bankruptcy proceedings. Accordingly, the Mark constituted after-acquired (or post-petition) property, which is generally considered "the debtor's personal property, clear of all claims that are ultimately discharged in the bankruptcy case." 5 *Collier on Bankruptcy* ¶ 541.03. "[P]roperty acquired post-petition by the *individual* debtor is usually not property of the estate." *Id.* (emphasis in original).

As a Chapter 7 debtor, Fitzner was not required to update his schedule of assets for any after-acquired property, except for several categories of property not applicable here. *See* 11 U.S.C. § 541(a)(5); Fed. R. Bankr. P. 1007(h) (imposing a duty to submit a supplemental schedule for property received from certain bequests, property-settlement agreements and life-insurance policies); *see also In re Adair*, 253 B.R. 85, 90 (B.A.P. 9th Cir. 2000) (rejecting trustee's argument for a broad duty of debtor to update schedule). While a debtor must update his schedule of property if, for

example, he later learns of a claim that existed when he filed for bankruptcy protection, that requirement arises in connection with the debtor's general duty to disclose all of his interests in property existing when the case is commenced—i.e., the property constituting the bankruptcy estate. *In re Batten*, 351 B.R. 256, 258-59 (Bankr. S.D. Ga. 2006) ("If an interest is not property on the date a case is filed, it is not covered. This duty to disclose property of the estate is a continuing one." (internal quotation marks omitted, citations omitted)).

Of course, the transaction between BFI and Fitzner can hardly be considered an arms-length transaction. Because Fitzner was the sole shareholder, BFI was considered an "insider" with respect to Fitzner-as-a-debtor. 11 U.S.C. § 101(31)(A)(iv). Discharge of a bankruptcy case can be revoked if a debtor defrauds a creditor by engaging in a sham transaction with an insider. *Id.* § 727(a)(7). Yet, § 727 provides no support for Counterdefendants in this case for several reasons. Any challenge to the discharge would have to be brought as part of Fitzner's bankruptcy case, not this trademark case. Moreover, any challenge would have to be brought by a creditor or trustee. *Id.* § 727(d). Finally, the time for making such a challenge has passed. *Id.* § 727(e).

As after-acquired property, the Mark did not become part of Fitzner's estate when he acquired it from BFI; therefore, the Mark was not an unscheduled asset of the estate when the trustee abandoned the remaining estate and the bankruptcy case was closed for the second and final time. Fitzner held the Mark clear of the bankruptcy estate, meaning he could sue or defend on the Mark in courts in Texas or other states. He could also license the Mark, including the right to sue or defend on the Mark. Accordingly, Fitzner's failure to list the Mark on his initial schedule and his

decision not to amend his schedule when he acquired the Mark from BFI did not strip him of the capacity to sue on the Mark.

**C.     The District Court Correctly Declined to Apply Judicial Estoppel**

The Counterdefendants argue in the alternative that the counterclaims should be dismissed under the doctrine of judicial estoppel. "[J]udicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." *United States v. Bussell*, 504 F.3d 956, 963 (9th Cir. 2007) (internal quotation marks omitted). It is an equitable doctrine invoked at a court's discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The district court denied the Counterdefendants' motion for dismissal based on judicial estoppel because it found that Fitzner's failure to schedule his beneficial title was inadvertent. *GRL I*, 463 F. Supp. 2d at 662.

The Counterdefendants ask us on appeal to estop Fitzner from arguing that his failure to schedule the beneficial title to the Mark was inadvertent. Yet, as explained above, Fitzner's failure to list his beneficial title at the commencement of his bankruptcy case had no lasting effect on this case. Fitzner's original position in this litigation as well as the bankruptcy case was, in the final analysis, the correct one: BFI owned the Mark until the company transferred it to Fitzner in January 2005. It was only after the district court made its erroneous ruling in *GRL I* that Fitzner asserted a different position before the bankruptcy court—a position inconsistent with his original one, but entirely consistent with the district court's ruling. Thus, we reject the Counterdefendants' alternative judicial estoppel argument.

On a final note, the Counterdefendants do not explicitly ask that we give preclusive effect to the bankruptcy court's statement that Fitzner's estate "owns" the Mark.  They do, however, allude to the argument in their primary brief. *See* Counterdefendants/Appellees' Br. at 42.  The bankruptcy court did not actually decide whether Fitzner's estate owned the Mark, but rather was merely summarizing the district court's earlier decision when the bankruptcy court stated: "Recently the judge in that action [the trademark case in the Eastern District of Michigan] has ruled that the bankruptcy estate owns the trademark rather than the Debtor." *In re Bobbie Fitzner*, order at 2.  As explained above, the district court did not find in its October 24, 2006, decision that Fitzner's estate owned full title to the Mark, but rather that the estate held beneficial title to the Mark. *GRL I*, 463 F. Supp. 2d at 661.  Incidental statements by a judge, including the misreading of another court's earlier decision, do not have preclusive effect. 18 Wright § 4420.

## III

As explained above, Fitzner has capacity to sue on the Mark, as does HMC through Fitzner.  Accordingly, we REVERSE the district court's dismissal of this action and remand the action to the district court for further proceedings consistent with this opinion.