Brian Quinn, Chief Justice
"The pound of flesh which I demand of him is deerely bought, 'tis mine, and I will have it," says Shylock and as undoubtedly read by the United States.[1]
This is an appeal from a final summary judgment denying Oscar Renda (Renda) recovery from attorney Brian Erikson and the law firm of Quilling, Selander, Lownds, Winslett & Moser, P.C. (collectively referred to as Erickson). Renda had sued Erikson and the law firm for legal malpractice. We reverse.[2]
Background
The factual background to this appeal was captured in United States v. Renda Marine, Inc. , 667 F.3d 651 (5th Cir. 2012), cert. denied , 569 U.S. 918, 133 S.Ct. 1800, 185 L.Ed.2d 811 (2013), and United States v. Renda , 709 F.3d 472 (5th Cir. 2013), cert. denied , 571 U.S. 1010, 134 S.Ct. 618, 187 L.Ed.2d 400 (2013). Should one care for an enhanced discussion of it, they are invited to peruse those opinions.
The dispute begins with (1) the performance by Renda Marine, Inc. (Marine) of a contract to dredge the Houston-Galveston shipping channel on behalf of the United States in 1998; (2) a request for additional compensation once the corporation began performing; (3) the government granting the request in part; (4) the initiation by Marine of an administrative proceeding with a government contract officer to secure more funds; (5) the contract officer's failure to approve the request within a specified time limit, which was tantamount to a denial of the request; (6) Marine contesting the denial in the Court of Federal Claims; (7) the United States filing counterclaims with the contract officer through which counterclaims it sought damages from Marine; (8) the contracting officer *904 upholding the counterclaims and determining, in November of 2002, that Marine was indebted to the United States in an amount exceeding $11 million; and (9) Erickson neglecting to appeal the award on behalf of his client Marine within the allotted time.
The lapse by Erickson gave rise to Marine urging that its attorney committed malpractice. The complaint resulted in a settlement and release agreement being executed in 2005. The agreement was signed by Oscar Renda (Renda) who happened to be the president of Marine.
Allegedly, the failure to appeal the contracting officer's determination was not the only instance of malpractice, according to Renda. Another purportedly occurred in 2003 and involved a transfer of Marine's assets to various corporate creditors. The transfer would have the effect of rendering the corporation insolvent, given the amount of debt it owed. Furthermore, the proposed recipient creditors included Renda, at least one of his relatives, and an independent corporate entity in which Renda held an interest, Renda Contracting, Inc. They did not include the United States, however, despite its outstanding $11.8 million claim. According to Renda and his certified public accountant (CPA), Erickson not only provided legal advice to them about the transaction but also "blessed" it. The transfer being so "blessed," Renda effectuated the measure in July of 2003.[3] Another such transfer would occur in 2005 when the $2 million paid by Erickson to settle the first instance of malpractice found its way to Renda Contracting.
In the meantime, the Court of Federal Claims denied Marine's attack upon the contracting officer's denial of its claim. So too did it rebuff Marine's effort to utilize the same Court of Federal Claims proceeding to collaterally attack the contracting officer's award of $11.8 million to the United States. These decisions (1) were affirmed by the Federal Circuit Court in 2007 via its opinion in Renda Marine, Inc. v. United States , 509 F.3d 1372 (Fed. Cir. 2007), and (2) led to an enforcement action initiated by the United States in 2008. Encompassed within that action was an effort by the United States to recoup about $3 million in additional compensation mistakenly awarded Marine to complete the dredging contract. The enforcement suit resulted in a judgment favoring the United States for a sum approximating, with interest and penalties, $22 million, which judgment was affirmed by the United States Court of Appeals in 2012 via Renda Marine, Inc. , 667 F.3d 651.
Apparently by the time the government received its $22 million judgment, it not only discovered the aforementioned 2003 and 2005 asset transfers by Marine but also decided to secure payment of the corporation's debt from alternate sources. The alternate source of concern here was Renda himself. The United States sued him in 2009 alleging various causes of action, including one founded upon 31 U.S.C. § 3713 (the Priority Act). The Priority Act imposes liability upon the representatives of government debtors who paid debt without first paying the government.[4] The asset *905 transfers apparently constituted such payments, and the United States District Court entered judgment against Renda for over $12 million. That judgment was affirmed by the Fifth Circuit Court of Appeals in 2013 via Renda , 709 F.3d 472.
Asserting that he would not have undertaken the asset transfers had Erickson informed him of 31 U.S.C. § 3713(b), Renda commenced the malpractice suit at bar. His original petition was filed in June of 2014. Erickson joined issue, asserted the affirmative defenses of limitations and release, and filed both a no-evidence and traditional motion for summary judgment on those defenses. Summary judgment was awarded him, though the specific defense upon which the trial court based its decision went unmentioned.
Before us, Renda contends that his negligence claims were not encompassed within the release. Nor did limitations bar his suit, according to him, given the application of the Hughes tolling doctrine. Consequently, the trial court purportedly erred in granting the summary judgment. We agree.
Standard of Review
Though Erickson moved for both a traditional and no-evidence summary judgment, the trial court simply granted the traditional motion. Thus, we need not discuss the standard of review applicable to considering an appeal from a no-evidence motion. As for the standard applicable to a traditional motion, it is well-settled and needs little reiteration. Its description can be found in City of Richardson v. Oncor Elec. Delivery Co., LLC , 539 S.W.3d 252, 257-59 (Tex. 2018) ; In re M.E. , No. 07-16-00039-CV, 2018 WL 343503, at *2-3, 2018 Tex. App. LEXIS 195, at *5-6 (Tex. App.-Amarillo Jan. 8, 2018, no pet.) (mem. op.); and Ally Fin., Inc. v. Gutierrez , No. 02-13-00108-CV, 2014 WL 261038, at *5-6, 2014 Tex. App. LEXIS 792, at *12-14 (Tex. App.-Fort Worth Jan. 23, 2014, no pet.) (mem. op.).
We further mention that, because the trial court said nothing about the particular ground upon which it relied in granting the motion, the burden here is Renda's to illustrate that neither defense warranted judgment. This is so because if any ground supports the decision, we must affirm it. See State v. Ninety Thousand Two Hundred Thirty-Five Dollars & No Cents , 390 S.W.3d 289, 292 (Tex. 2013).
Limitations and the Hughes Doctrine
No one disputes that Renda's suit against Erickson arose from the purportedly negligent advice imparted in 2003 about the transfer of Marine's assets. Nor does anyone deny that the applicable limitations period is two years from the date the chose-in-action accrued. There is question, however, regarding when the negligence claim accrued and whether Renda initiated his suit within two years of that date.
One possible date fell in November of 2003 when Erickson gave and Marine acted upon the advice. If it applied, then the June 2014 suit Renda initiated was much too late. Another date was that calculated *906 through the application of Hughes v. Mahaney & Higgins , 821 S.W.2d 154 (Tex. 1991). Renda invoked that mode of calculating the date to establish the timeliness of his suit.
In Hughes , our Supreme Court held that, "when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted." Id. at 157. There, the Hugheses sought to adopt a child and hired Mahaney to effectuate the matter. See ids="9969320" index="19" url="https://cite.case.law/sw2d/821/154/">id. at 155. To that end, Mahaney obtained an affidavit relinquishing the rights of the biological mother and naming him as temporary managing conservator. Id. Thereafter, he filed suit on behalf of his clients to terminate her parental rights. Id. The biological mother subsequently revoked her affidavit and sought custody of the child. Id. So too did she move the trial court to dismiss the Hugheses' termination suit for lack of standing given that Mahaney named himself, as opposed to his clients, as the temporary conservator in the affidavit. Id. Though the trial court denied the motion to dismiss, terminated the biological mother's rights, and awarded custody to the Hugheses, the reviewing court concluded that they actually lacked standing and reversed the trial court's judgment. See ids="9969320" index="24" url="https://cite.case.law/sw2d/821/154/">id. at 155-56. The Hugheses petitioned the Texas Supreme Court to review the intermediate appellate court's decision. Id. at 156. The petition for writ of error was denied, and, on July 10, 1985, the Supreme Court also overruled the Hugheses' motion for rehearing. Id.
The Hugheses sued Mahaney and his law firm for malpractice on May 21, 1987. Id. Mahaney defended against the action by raising the affirmative defense of limitations. Id. The dispute eventually wound its way to the Supreme Court, which body issued the holding quoted above. See ids="9969320" index="29" url="https://cite.case.law/sw2d/821/154/">id. at 157.
The Hughes court made other statements we find particularly instructive: (1) "[w]e hold that the statute of limitations was tolled until all appeals were exhausted on the underlying suit in which the malpractice allegedly occurred"; (2) "[w]e need not decide when the Hugheses' cause of action against Mahaney accrued ... because regardless of the date it accrued we hold that the statute of limitations was tolled until all of the Hugheses' appeals in the termination action were exhausted"; and (3) "since the statute of limitations was tolled from the time the Hugheses' cause of action accrued until July 10, 1985, when we overruled the Hugheses' motion for rehearing ... in the termination of parental rights suit, the lawsuit that the Hugheses filed against Mahaney on May 21, 1987, is not barred by the two year statute of limitations." Id. at 155-56, 158 (emphasis added). These quotes are important since they illustrate that reference to the exhaustion of "all appeals on the underlying claim" meant the exhaustion of all appeals in the litigation of the claim being prosecuted or defended when the alleged malpractice occurred. Furthermore, the "claim" being prosecuted or defended was the attempt to secure a conservatorship and the adoption of the child. In turn, the "malpractice in the prosecution or defense of [that] claim" consisted of Mahaney's designation of himself as the temporary conservator in the affidavit, while the "results in litigation" component was the termination suit. And, most importantly, the "exhaustion of appeals on the underlying claim" component was comprised of all the appeals in the litigation through which the Hugheses sought to prosecute their claim, i.e., the termination suit.
*907 Of note, too, is the fact that when the malpractice occurred (i.e., naming the wrong temporary conservator in the affidavit), no litigation was pending. This is exemplified by that portion of the factual recitation wherein the Supreme Court said "the day the child was born Mahaney obtained a signed affidavit of relinquishment ... [t]he next day , Mahaney filed suit on behalf of the Hugheses to terminate the biological mother's parental rights and for adoption of the child." Id. at 155 (emphasis added).
Our foregoing observations about Hughes lead us to the following equation reflective of the Hughes tolling rule. Its elements are as follows: (1) a claim; (2) the prosecution or defense of that claim by or against the client; (3) the client's attorney committing malpractice in the prosecution or defense of that claim by or against the client; and (4) a lawsuit which may be filed after the malpractice occurs but nonetheless encompassing the prosecution or defense of the claim. If those elements exist, then the limitations period within which the client must sue his attorney for malpractice is tolled until the lawsuit encompassing the prosecution or defense of the claim by or against the client is finally resolved via the exhaustion of all appeals or otherwise.
About two weeks after issuing its opinion in Hughes , the Supreme Court had occasion to apply the Hughes rule in Gulf Coast Inv. Corp. v. Brown , 821 S.W.2d 159 (Tex. 1991) (per curiam). Gulf Coast involved a suit arising from legal services concerning the collection of a debt via a defective non-judicial foreclosure. The foreclosure resulted in the creditor, Gulf Coast, being sued by the debtor, the Smiths. Id. The Smiths won their suit and secured a judgment against Gulf Coast on May 12, 1989. Id. That resulted in Gulf Coast and the Smiths entering into a settlement agreement that dispensed with the need to prosecute any appeal. Id. Gulf Coast then sued its attorney (Brown) for malpractice on November 2, 1989. Id. The latter date happened to be more than two years from the date of the defective foreclosure, and that compelled Brown & Shapiro to raise the defense of limitations. Id. Ultimately, the malpractice action found its way to the Supreme Court.
In concluding that limitations had not expired, the Supreme Court first reiterated its rule in Hughes . Id. Then it said: "[w]e see no reason why the tolling rule announced by this court in Hughes ... should not apply when the attorney's malpractice results, not in an appeal on the underlying claim, but in a wrongful foreclosure action by a third-party against the client." Id. The court continued, "we hold that when an attorney's malpractice in conducting a non-judicial foreclosure sale of real property results in a wrongful foreclosure action against the client, the statute of limitations on the malpractice claim is tolled until the wrongful foreclosure action is finally resolved." Id. Though some may suggest otherwise, it seems that the holding in Gulf Coast presented a nuance to Hughes .
No doubt, the "claim" being prosecuted when the malpractice occurred was the debt claim of Gulf Coast against the Smiths' property. See Celltex Site Servs., Ltd. v. Kreager Law Firm , No. 04-12-00249-CV, 2012 WL 6720663, at *2-3, 2012 Tex. App. LEXIS 10697, at *7-8 (Tex. App.-San Antonio Dec. 28, 2012, pet. denied) (mem. op.) (so observing). And, as in Hughes , no suit was pending when the malpractice occurred for Gulf Coast was pursuing remedies outside the courtroom. But, unlike Hughes, the party having the "claim," Gulf Coast, did not initiate a subsequent lawsuit. Instead, it was sued by the debtor due to the defective manner in *908 which it sought to collect the debt (i.e., improper foreclosure notice). Additionally, the cause of action underlying the suit was not a suit upon the "claim" of Gulf Coast but rather litigation founded upon an independent chose-in-action (i.e., wrongful foreclosure) arising from the malpractice occurring in Gulf Coast's attempt to pursue its "claim."
So, as can be seen, the circumstances of Gulf Coast did not neatly fit within the Hughes equation. There was a claim (i.e., debt claim). That claim was being prosecuted by the client (Gulf Coast) through a non-judicial foreclosure. The client's attorney committed malpractice in the prosecution of that claim by affording improper notice of the foreclosure. However, there was no lawsuit encompassing the prosecution or defense of the claim by Gulf Coast. Instead, the Smiths initiated their own suit against Gulf Coast. And, though the substance of their cause of action arose from the effort by Gulf Coast to pursue its claim, it was not founded upon the legitimacy of the debt claim of Gulf Coast. It was founded upon a wrong or injury caused by the mistake Gulf Coast's attorney committed when prosecuting the debt claim. Nonetheless, the Supreme Court deigned to extend "the tolling rule announced ... in Hughes " to the circumstances in Gulf Coast .
In extending the rule, the court focused not on whether the "claim" itself formed the cause of action in a subsequent lawsuit, or the trial of that suit, or the exhaustion of any appeals from the trial of that suit. It focused on the malpractice occurring when the client endeavored to pursue its "claim" and whether that malpractice resulted in the client being sued by a third-party. In other words, the tolling equation developed in Gulf Coast had as its components: (1) a claim; (2) the prosecution of or defense against that claim by the client; (3) the client's attorney committing malpractice in the prosecution of or defense of that claim, and (4) the malpractice causing or resulting in a third-party suing the client. If those elements to the equation existed, then the limitations period within which the client had to sue his attorney for malpractice was tolled until the ultimate resolution of the third-party's suit against the client.
Gulf Coast was not the end of the Supreme Court opinions regarding the application of the Hughes tolling rule, however. There were others. One is Apex Towing Co. v. Tolin , 41 S.W.3d 118 (Tex. 2001). There, we were told that "without re-examining whether the policy reasons behind the tolling rule apply in each legal-malpractice case matching the Hughes paradigm, courts should simply apply the Hughes tolling rule to the category of legal-malpractice cases encompassed within its definition." Id. at 122 ; accord Edwards v. Dunlop-Gates , 344 S.W.3d 424, 432 (Tex. App.-El Paso 2011, pet. denied) (noting that the Apex court directed "[l]ower courts ... to follow 'a categorical approach' to employing the Hughes tolling principles"); Estate of Whitsett v. Junell , 218 S.W.3d 765, 769 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (alluding to the categorical approach and bright-line rule established in Hughes and reiterated in Apex ).
Having in mind the directive to follow that categorical approach, we turn our eye to the summary judgment record at bar.[5] The record contains evidence of *909 the following facts. A CPA acting on behalf of Marine, Renda, and another company in which Renda held an interest sought advice from Erickson regarding Marine's "precarious financial situation." That financial situation was due to mounting debt and ongoing litigation between Marine and the United States. The two spoke about placing Marine in bankruptcy, a suggestion Erickson counseled against due to its potential impact upon the ongoing litigation regarding performance of the dredging contract and payment for services rendered under it. That led the CPA to ask about the prospect of transferring the assets of Marine to satisfy certain debt. Though the debt claims he proposed to pay excluded those of the United States, they included those held by Renda individually and others. And, once "Erikson blessed the transfer of assets I proposed," according to the CPA, the transfer occurred.
At the time Erickson rendered his advice, Renda himself was not a party to the legal actions between the United States and Marine. He became one, though, when the United States sued Renda under 31 U.S.C. § 3713 for causing the transfer. See United States v. Renda , 709 F.3d at 481 (stating that "it is undisputed that Renda, acting as [ ] Marine's representative, caused [ ] Marine to make the" transfers).
Alluding back to our footnote four, we reiterate that the Priority Act obligates a debtor to prioritize any payments due the federal government when satisfying debt. First, it mandates that a "claim of the United States ... shall be paid first when ... a person indebted to the Government is insolvent and ... the debtor without enough property to pay all debts makes a voluntary assignment of property." 31 U.S.C. § 3713(a)(1)(A)(i). Second, when the government is not paid first then the "representative of a person or an estate ... paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." Id. § 3713(b). The latter provision has been described as giving "the Priority Statute 'teeth' by making a representative who pays a non-federal debt on behalf of a corporation before paying a federal claim personally liable for the amount paid." Renda , 709 F.3d at 480 (emphasis added). " 'Read literally ... [it] ... require[s] the management of a solvent business ... to act at its peril in paying other debts while federal claims are owing, for if the business should later become unable to pay the federal claims[,] the management could be liable....' " Id. (quoting William T. Plumb, Jr., The Federal Priority in Insolvency: Proposals for Reform , 70 MICH. L. REV. 1, 87 (1971) ). And, that is what happened here once Renda, as both president and creditor of Marine, heeded the advice of Erickson.
Simply put, the summary judgment record contains evidence of (1) a claim, (2) the prosecution of or defense against that claim by the client, (3) the client's attorney committing malpractice in the prosecution of or defense of that claim, and (4) the malpractice causing or resulting in a third-party suing the client. The claims included the debt claims of the United States and Renda against Marine. While Renda, as president of Marine, was attempting to defend against those of the United States, *910 he was also attempting to pay his own . The CPA, who happened to be acting on behalf of both Marine and Renda, then approached Erickson for advice about legal options to further Renda's goals.[6] Erickson considered the options and "blessed" one. The one he "blessed" and Marine followed placed Renda within the "teeth" of § 3713(b), despite acting as president of Marine when effectuating the asset transfers. The ill-advised advice (i.e., purported legal malpractice committed by Erickson) now exposed Renda to personal liability for the debt Marine owed the United States and a lawsuit by the United States (a third-party) to collect that debt. The suit eventually came in 2009 and resulted in a judgment against Renda personally. Renda's efforts to reverse that judgment ended when the United States Supreme Court denied his petition for writ of certiorari in 2013. Having lost, Renda then sued Erickson within two years for the alleged malpractice committed years earlier. Because we have been directed to apply the Hughes tolling rule (as modified by Gulf Coast ) categorically and that rule says nothing about a time limit within which a third-party must sue the client of the attorney who committed the malpractice, it matters not that the United States sued Renda some six years after Erickson "blessed" the asset transfer. At the very least, these circumstances tend to fall into the Hughes equation as modified in Gulf Coast and create a material issue of fact regarding whether Erickson proved his entitlement to summary judgment on limitations as a matter of law.
Admittedly, the transfer proposed by the CPA and "blessed" by Erickson could be likened to a transaction for a transaction had to occur to complete it. We mention this because Erickson argued that Hughes does not apply to malpractice occurring in transactional work. We agree with his general observation, given the prior holdings of this Court and other intermediate courts of appeal. See Brennan v. Manning , No. 07-06-00041-CV, 2007 WL 1098476, at *2, 2007 Tex. App. LEXIS 2838, at *5 (Tex. App.-Amarillo Apr. 12, 2007, pet. denied) (mem. op.) (holding that "[t]he Hughes rule ... is expressly limited to cases involving claims of attorney malpractice in the prosecution or defense of the underlying litigation and does not apply to malpractice claims involving transactional work"); see also CellTex Site Servs. , 2012 WL 6720663, at *4, 2012 Tex. App. LEXIS 10697, at *11-12 (discussing the plethora of cases addressing the issue and reiterating that "[t]his court has been joined by several of our sister courts in holding that the Hughes tolling doctrine does not extend to transactional work. Applying this court's holding in Burnap [v. Linnartz , 914 S.W.2d 142 (Tex.App.-San Antonio 1995) ], we refuse to extend the Hughes tolling doctrine to the facts of the instant case."); Murphy v. Mullin, Hoard & Brown, L.L.P. , 168 S.W.3d 288, 292-93 (Tex. App.-Dallas 2005, no pet.) (stating that "[a]lthough we recognize that the citations contained in Apex create some ambiguity regarding application of the Hughes rule to cases arising from transactional work, we are persuaded by the Houston First Court of Appeals's analysis of Hughes , Murphy , and Apex and agree that alleged attorney malpractice claims based on transactional work are not tolled under the Hughes rule"); Vacek Group, Inc. v. Clark, 95 S.W.3d 439, 447 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (stating that "we believe that the supreme court *911 will not apply the Hughes tolling rule to a malpractice claim arising out of transactional work performed by attorneys that occurs before litigation commences").
Yet, to simply equate advice about a transfer under the circumstances here to mere transactional work would be too shallow of an analysis. This is so because of the evidence to which we alluded above. It could reasonably induce a fact-finder to infer that more was occurring and that it related to the prosecution or defense of claims. Again, Marine had creditors. Those creditors included its president Renda and the United States. The latter's debt claims alone just happened to exceed by several million dollars the value of Marine's limited assets, which, in turn, indicates Marine was both insolvent and unable to pay all its creditors. See Insolvency , BLACK'S LAW DICTIONARY 867 (9th ed. 2009) (defining insolvency as the "condition of being unable to pay debts as they fall due or in the usual course of business"). So, Renda and the CPA were investigating options, and those options included consideration of the following questions: "Which debt claims do we pay? Ours or ...?" Erickson informed them that they could pay theirs. So, some evidence also appears of record creating a material issue of fact regarding whether the advice pertained to merely transactional work or the prosecution or defense of claims.
As for Erickson's contention that "no case has ever applied Hughes where the client alleging malpractice is not the same client whose claims were being prosecuted or defended when the malpractice allegedly occurred," we say the following. Erickson apparently refers to the distinction between Marine and Renda. But, as mentioned above, the CPA attested that he was approaching Erickson on behalf of both Marine and Renda. Reading that testimony in a light most favorable to Renda, we see that it could be reasonably interpreted as illustrating that the CPA appeared before Erickson seeking advice on behalf of the corporation and Renda, individually. So, another material question of fact exists. It involves the group of clients to whom Erickson gave advice, whether it encompassed Renda in his personal capacity. In other words, Erickson failed to prove as a matter of law that the "client alleging malpractice is not the same client whose claims were being prosecuted or defended when the malpractice allegedly occurred."
In sum, material issues of fact exist regarding the applicability of the Hughes tolling rule as modified in Gulf Coast . A jury may well resolve those issues of fact in a manner favoring Renda. Should it do so, then limitations was tolled until the underlying suit (i.e., the Priority Suit) was finally resolved. That occurred in 2013, when the last appeal was denied by the United States Supreme Court. And, because Renda sued Erickson for legal malpractice within two years of that date, Erickson failed to establish, as a matter of law, entitlement to judgment upon the affirmative defense of limitations.
Affirmative Defense of Release
Next, we consider the affirmative defense of release encompassed within the motion for summary judgment. The document at issue purporting to release Erickson was signed by Marine and Oscar Renda Contracting, Inc. (Contracting) on December 22, 2005. The individual executing it on behalf of those entities was Renda (1) "As Authorized Representative For Renda Marine, Inc. And All Of Its Parents, Subsidiaries, Affiliates, And Shareholders Of Renda Marine, Inc." and (2) "As Authorized Representative For Oscar Renda Contracting, Inc. And All Of Its Parents, Subsidiaries, Affiliates, And Shareholders Of Oscar Renda Contracting, *912 Inc." The parties to the agreement were described as:
Renda Marine, Inc., and Oscar Renda Contracting, Inc., on behalf of the parents, subsidiaries, affiliates, officers, directors, and shareholders of Renda Marine, Inc., and Oscar Renda Contracting, Inc., (hereafter referred to as "Releasors") and Quilling, Selander, Cummiskey & Lownds, all of its employees, officers, shareholders, and any and all attorneys affiliated therewith (hereinafter collectively referred to as the "Law Firm").
The initial paragraph under the moniker "Background Recitals" described various matters in which Erickson represented Marine and Contracting, Inc. The parties stated therein:
WHEREAS Releasors retained the Law Firm in connection with: (1) the prosecution and defense of claims and issues arising under or related to Releasor's Houston-Galveston Ship Channel Dredging contract with the U.S. Army Corps of Engineers, Contract No. DACW64-99-C-0001, which included a November 26, 2002, Contracting Officer's Final Decision related to said contract, and all claims and defenses which were or could have been brought in Cause No., 02-306-C in the United States Court of Federal Claims and (2) legal representation of Oscar Renda Contracting, Inc. in connection with litigation involving H&S Supply Company, Including but not limited to proceedings in Oscar Renda Contracting, Inc. v. H & S Supply Company, Inc., trial court Cause No. 2003-60165-393, Court of Appeals No. 10-05-00059-CV. The matters described above in (1) and (2) are hereinafter collectively referred to as the "Litigation" ....
Through another paragraph, the parties stated: "WHEREAS Releasors and the Law Firm desire that all matters in controversy between them related to any and all legal services provided at any time by the Law Firm related to the Litigation described above be fully and forever settled and released and compromised[.]" Following that was a description of the consideration being exchanged by the parties to effectuate the release. That is, in exchange for $2,000,000, the "Releasors"
do hereby compromise, settle and fully release and forever discharge the Law Firm of and from any and all claims, demands, controversies, actions, or causes of action of any kind, whether based on common law, equity, or statutory authority, which Releasors have held or may now or in the future own or hold for any type of damage or loss, including but not limited to, economic damage, property damage, personal injuries, bodily injuries, costs, expenses, legal fees, or any other loss or damage of any kind, whether known or unknown, arising from or in any way growing out of or resulting from or to result in the future from the Law Firm's legal representation of Releasors in connection with the Litigation described above. In addition to the Release herein, Releasors promise and agree not to make a claim, file any petition, complaint, or any legal action against the Law Firm or any lawyer associated with the Law Firm that arises out of, concerns or in any way relates to the Litigation.
Erickson posited below that because the "Releasors" included the "officers, directors, and shareholders" of Marine and Contracting and Renda was an officer, director, and shareholder of the corporation, he compromised any malpractice complaint he may have had arising from the advice about the asset transfer. That the injuries may have been suffered by Renda in his personal capacity did not matter. He released them. We disagree.
*913 A release is nothing more than a contract; as such, it is subject to interpretation under the rules applicable to the general construction of contracts. See D.R. Horton-Tex., Ltd. v. Savannah Props. Assocs., L.P. , 416 S.W.3d 217, 226 (Tex. App.-Fort Worth 2013, no pet.) (stating that a release is a contract in which one party surrenders a legal right or obligation owed by the other party and is subject to the normal rules of contract construction). So, our primary goal when interpreting a release is to ascertain and effectuate the intent of the parties to the agreement. Id. That obligates us to read the instrument as a whole and accord its language its plain grammatical meaning unless doing so defeats the parties' intent. Id. Additionally, our focus is on the document and the words therein, "not what the parties allegedly meant." Id. Nor is it on any parol evidence that the parties may attempt to introduce to create ambiguities or alter the intent expressed within the instrument if the document is otherwise unambiguous. See ids="7331759" index="61" url="https://cite.case.law/sw3d/416/217/#p226">id. (stating that "[a]n unambiguous contract will be enforced as written" and "[p]arol evidence may not be introduced to create an ambiguity or to alter the intent of the parties as expressed in the instrument").
Next, to be effective as a release, the instrument must mention the claim or claims being released. Id. Yet, this does not require the parties to explicitly identify every cause of action being released or anticipate every potential cause of action and mention it. Id. Rather, their identity may be quite general in nature. See, e.g. , Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. , 20 S.W.3d 692, 697-98 (Tex. 2000) (wherein the instrument identified the claims as "any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly attributable to the rendition or [sic] professional legal services by KMC to Granada between June 1, 1988 and April 1, 1992"). And, in those circumstances, claims "not clearly within the subject matter of the release are not discharged," even if they existed at the time the parties executed the release. D.R. Horton-Tex. , 416 S.W.3d at 226 ; accord Victoria Bank & Trust Co. v. Brady , 811 S.W.2d 931, 938 (Tex. 1991) (stating that "[e]ven if the claims exist when the release is executed, any claims not clearly within the subject matter of the release are not discharged"). Conversely, claims which are clearly within the subject matter of the release are relinquished. See D.R. Horton-Tex., Ltd. , 416 S.W.3d at 226. This includes unknown claims and damages which develop in the future because the parties may release them too. See ids="7331759" index="68" url="https://cite.case.law/sw3d/416/217/#p226">id. ; accord Keck, Mahin & Cate, 20 S.W.3d at 698 (stating that, "[a]lthough releases often consider claims existing at the time of execution, a valid release may encompass unknown claims and damages that develop in the future"). One other cautionary directive must be heeded when construing general release clauses: our Supreme Court requires us to construe them narrowly. See Victoria Bank & Trust , 811 S.W.2d at 938.
The release at issue created a framework encompassing the claims being relinquished. Its borders were defined by the phrase "arising from or in any way growing out of or resulting from or to result in the future from the Law Firm's legal representation of Releasors in connection with the Litigation ." (Emphasis added). "[T]he Litigation" consisted of (1) "the prosecution and defense of claims and issues arising under or related to" the dredging contract between the United States and Renda Marine, (2) the "November 26, 2002[ ] Contracting Officer's Final Decision related to said contract," (3) "all *914 claims and defenses which were or could have been brought in Cause No. 02-306-C in the United States Court of Federal Claims," and (4) representation in various suits involving parties other than Renda Marine and the United States.
The record before us discloses that the recovery sought by the United States via the Priority Suit stemmed from the dredging contract, the "Contracting Officer's Final Decision related to said contract" and the prosecution or defense of claims relating to that contract. For instance, paragraphs "5," "6," and "7" of the government's "complaint" initiating the Priority Suit mentioned (1) the dredging contract, (2) the difficulties Marine experienced performing it, (3) the litigation arising from Marine's performance of the contract, and (4) the November 26, 2002 "Final Decision" of the "Contracting Officer" rendered "upon government claims against Renda Marine relating to the Upper Bayou Contract in the total amount of $11,860,016." See Renda , 709 F.3d at 478 (alluding to the federal district court action not only to enforce the $11.8 million claim awarded in the Final Decision but also to recoup $3 million in payments made to Marine as additional compensation to complete the contract). Other averments in the pleading included (1) the July 2003 asset transfer to creditors other than the United States, (2) Renda's status as the president of and a majority shareholder in Marine when the transfer occurred, (3) Renda's knowledge of the contracting officer's " 'Final Decision' " when the transfer occurred, (4) his status as a " 'representative' " of Marine for purposes of 31 U.S.C. § 3713(b), and (5) the government's demand for judgment against "Oscar Renda ... under the Federal Priority Statute." And, as confirmed in Renda , Renda was ultimately found liable to the government via the application of 31 U.S.C. § 3713(b) to the asset transfer. See Renda , 709 F.3d at 479-85 (discussing the statute and its application to the circumstances of the asset transfers).[7]
Simply put, the summary judgment record illustrates that Renda's malpractice claim against Erickson derived from the advice Erickson gave concerning the payment of monetary obligations due creditors of Marine. Some of those creditors had made loans to the corporation to enable it to perform the dredging contract. As such, they had claims against the corporation and sought to prosecute them to satisfaction. Yet, the corporation was also indebted to the United States for the sum of $11.8 million due to Marine's "deficient or incomplete" performance of the very same dredging contract. Id. at 477 (quoting from the "Final Decision" of the contracting officer).
While defending the corporation against the government claims, Erickson advised it of an avenue available to satisfy the claims of its non-government creditors. Moreover, the avenue selected was influenced by Erickson's concerns about the effect a bankruptcy would have upon the corporation's pursuit of its own claims against the United States, which claims also emanated from the performance of the dredging contract. Ultimately, the corporation's decision to heed Erickson's legal advice resulted in (1) the asset transfer, (2) the subsequent Priority Suit against the president of Renda Marine, and (3) the subsequent malpractice suit initiated by *915 the president of Renda Marine against Erickson. Given that (1) the release encompassed "any and all claims ... or causes of action of any kind ... Releasors have held or may now or in the future own or hold for any type of damage or loss ... arising from or in any way growing out of or resulting from ... the Law Firm's legal representation of Releasors in connection with the Litigation" and (2) "the Litigation" encompassed "the prosecution and defense of claims and issues arising under or related to " the dredging contract, we cannot but conclude that the circumstances underlying the malpractice claim at bar fall within the scope of representation "in connection with the Litigation." (Emphasis added).
The pivotal question becomes whether the president of Renda Marine was one of the "Releasors." To answer that, we return to the wording of the release. The parties began the document with the following declaration: "This Release is signed by and entered into voluntarily by the following parties." Then they described the "following parties" as (1) "Renda Marine, Inc., and Oscar Renda Contracting, Inc., on behalf of the parents, subsidiaries, affiliates, officers, directors, and shareholders of Renda Marine, Inc., and Oscar Renda Contracting, Inc., (hereafter referred to as 'Releasors')" and (2) "Quilling, Selander, Cummiskey & Lownds, all of its employees, officers, shareholders."
According to the summary judgment evidence, Renda was president of Marine. As such, he was an "officer" of the corporation. See TEX. BUS. ORGS. CODE ANN. § 21.417 (West 2012) (identifying "president" as one of the corporate "officers" to be elected by a board of directors of a corporation); Bennett v. Reynolds , 315 S.W.3d 867, 884 (Tex. 2010) (characterizing corporation's president as "the highest corporate officer"). Thus, Renda fell within the category of "Releasors" as that term was designated in the release.
Problem arises with the manner in which Renda executed the release. Admittedly, he did so in a representative capacity as illustrated by the language beneath his signature. That language was as follows: "By Oscar Renda, As Authorized Representative For Renda Marine, Inc. And All Of Its Parents, Subsidiaries, Affiliates, And Shareholders Of Renda Marine, Inc." Comparing it with the description of "Releasors" reveals that the two are not identical, though. The latter includes the words "officers" and "directors" while the former does not. This is of import for two reasons. First, a release does not bind those who are not party to it. First Trust Corp. TTEE FBO v. Edwards , 172 S.W.3d 230, 239 (Tex. App.-Dallas 2005, pet. denied) ; Dwyer v. Sabine Mining Co. , 890 S.W.2d 140, 143 (Tex. App.-Texarkana 1994, writ denied). Second, our jurisprudence obligates us to interpret a writing by affording meaning to all of its language when possible. See J.M. Davidson, Inc. v. Webster , 128 S.W.3d 223, 229 (Tex. 2003) ; see also CKB & Assocs. v. Moore McCormack Petrol., Inc. , 734 S.W.2d 653, 655-56 (Tex. 1987) (in construing breadth of release, refusing to expand coverage to include claims not expressly included in language specifically identifying covered claims, citing the maxim expressio unius est exclusio alterius -the expression of one thing is the exclusion of another thing). So, if we look only to the description of "Releasors," we see an intent to include the officers and directors of Marine within its scope. But, if we look to the words designating on whose behalf Renda purported to sign the document, we encounter his intent to exclude officers and directors of the corporation since they were not mentioned. At the very least, this *916 indicates that he did not intend to execute the document on behalf of officers and directors of Marine though he did on behalf of the corporation and its parents, subsidiaries, affiliates, and shareholders.
While it may be that Renda was also a shareholder of Marine that does not necessarily mean he waived claims attributable to his capacity as officer or director. And, his claim against Erickson derived from his capacity as a corporate officer or "representative" of Marine. As Renda said through one of his affidavits, "[n]either Erikson ... nor any member of the Quilling Firm had ever informed me, or to my knowledge, anyone associated with me, that I could be held personally liable under the Priority Statute for making the [asset] transfers." Had he been so informed he "would never have authorized or approved the transfers." Neglecting to so advise Renda formed the basis of his malpractice claim, according to the averments in his live pleading. Additionally, the damages he sought were "an amount at least equal to the amount he was forced to pay the government." And as previously discussed, the "amount he was forced to pay the government" reflected his liability as an officer or "representative" of Marine who paid debts owing to third parties before paying debts owing to the United States. Consequently, his liability to the government expressly arose from his capacity as president of (i.e., an officer of) the debtor corporation, not as a shareholder, and his signature on the release omits any suggestion that he was acting on behalf of Marine or Contracting officers and directors when executing the document. At the very least, the words of the instrument muddle the picture of who released his claims. This, in turn, triggers the admonishments D.R. Horton-Texas and Victoria Bank & Trust telling us that "claims not clearly within the subject matter of the release are not discharged." See D.R. Horton-Tex., Ltd. , 416 S.W.3d at 226 ; Victoria Bank & Trust , 811 S.W.2d at 938.
One other matter further muddles the picture. It concerns the lack of reference to claims held in the individual capacity of directors and officers. As previously mentioned, the release purported to encompass any and all claims related to Erickson's representation of the "Releasors" in connection with "the Litigation." Moreover, the parties used rather global verbiage in describing "the Litigation." So, one may reasonably view the release as being general in nature and within the realm of D.R. Horton-Texas and Victoria Bank & Trust . This seems especially so given that Erickson invites us to read it as rather global and all-encompassing. And, therein lies the problem. The release says nothing about claims owned by an officer, director, or shareholder in capacities other than as an officer, director, or shareholder of Marine. As recognized in Dwyer , an instrument purporting to release the claims of "all employees, agents, and representatives" of a particular entity does not necessarily prevent the employee, agent or representative of the entity from "pursuing his own remedies for his own injuries." See Dwyer , 890 S.W.2d at 143. Here, Renda sued to recompense injury he personally suffered due to heeding the advice of Erickson; he did not sue to recompense injury suffered by Marine. Given the global nature of the release and its lack of clarity regarding whether it purported to encompass choses-in-action being pursued by officers, directors, and shareholders to redress their own personal injuries, we cannot say that Renda's malpractice suit "clearly" fell within the subject matter of the release. That, in turn, leads us to conclude, per D.R. Horton-Texas and Victoria Bank & Trust , that it did not.
In sum, we conclude Erickson failed to prove, as a matter of law, that Renda's *917 individual claims were released in the settlement agreement. This, coupled with our conclusion regarding the defense of limitations means that no ground for summary judgment urged by Erickson supports the trial court's decision. Thus, we reverse the final summary judgment of the trial court and remand the cause.

Because this appeal was transferred from the Second Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this court. See Tex. R. App. P. 41.3.

William Shakespeare , The Merchant of Venice act 4, sc. 1.

Excluded from the transfer were the monetary claims Marine was pursuing against the United States in the Court of Federal Claims. They were purportedly excluded based upon the advice of Erickson.

Per the statute, a claim of the United States shall be paid first when the debtor is insolvent, voluntarily assigns property, to a third-party, and lacks enough assets to pay all debts. See 31 U.S.C. § 3713(a)(1)(A)(i). So too does it state that a "representative of a [debtor] ... paying any part of a debt of the [debtor] ... before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." Id. § 3713(b). See Renda , 709 F.3d at 480 (holding that under § 3731, "a corporate officer is personally liable if, on behalf of the corporation, he (1) pays a non-federal debt (2) before paying a claim of the United States (3) at a time when the corporation was insolvent, (4) if he had knowledge or notice of the claim"). The existing "claim" when the 2003 asset transfer occurred consisted of the government contracting officer's determination in November of 2002 that Renda Marine owed the United States $11.8 million. See id. at 484 (holding that the word " 'claim' " includes a contracting officer's determination that a government contractor is indebted to the government).

In perusing the summary judgment record, we are also mindful to abide by additional rules regulating appeals from summary judgments. One obligates us to assess whether the summary judgment movant (Erickson) established his affirmative defenses of release and limitations as a matter of law. See Randall's Food Mkts. Inc. v. Johnson , 891 S.W.2d 640, 644 (Tex. 1995) (stating that "a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment"). Another directs us to view the record in a light most favorable to the non-movant when determining if the movant carried its burden. See ids="10016780" index="89" url="https://cite.case.law/sw2d/891/640/#p644">id. (observing that, when "reviewing a summary judgment, we must accept as true evidence in favor of the non-movant, indulging every reasonable inference and resolving all doubts in his or her favor").

We say nothing about any potential conflicts of interest engendered by Renda's pursuit of both personal and corporate desires at the time and Erickson's apparent willingness to advise him on both.

We note that two asset transfers were mentioned in the opinion. One was that occurring in July of 2003. The other related to the $2 million Erickson paid in exchange for the release. Marine gave those monies to Oscar Renda Contracting, Inc., in December of 2005. Renda , 709 F.3d at 478. The government not only sought but also obtained recovery against Renda for both transfers. Id.